IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR M. DANSBURY, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | 3:12-CV-00391 |
| | : | (JUDGE MARIANI) |
| EOG RESOURCES, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. Introduction

Presently before the Court is a Motion to Dismiss filed by Defendant EOG

Resources, Inc. (Doc. 40). The underlying action stems from a series of disputes arising out

of oil and gas leases entered into between the landowner Plaintiffs and the oil and gas

company Defendant. The Motion seeks dismissal of Count II (Slander of Title), Count III

(Breach of Contract), and Count V (Unjust Enrichment) of Plaintiffs' Second Amended

Complaint. For the reasons discussed below, the Court will grant in part and deny in part

Defendant's Motion.

### II. Factual Background and Procedural History

The Complaint at issue (Doc. 35) is the Second Amended Complaint. It is, however,

the first complaint to be reviewed by this Court, as the first two were withdrawn voluntarily

by the Plaintiffs.

The Second Amended Complaint alleges the following well-pleaded facts.

Plaintiffs Arthur M. Dansbury and Joan M. Dansbury—a husband and wife—entered into a form "Oil and Gas Lease" with nonparty Douglas Oil and Gas, Inc., on or around March 26, 2001. (Second Am. Compl., Doc. 35, at ¶ 10.)   Later, on March 8, 2007, the Dansburys transferred the leasehold property to one Arthur B. Dansbury and his wife Nancy L. Dansbury, while reserving to themselves rights to certain royalty and other payments under the original terms of the lease. (*Id.* at ¶ 13.) Likewise, the Lessee's interest was transferred twice, finally ending up with Defendant EOG Resources. (*Id.* at ¶¶ 16-17.)

The Lease took effect on March 26, 2001, for a term of five years, and provided the Lessee with "exclusive rights for 'drilling, operating for, producing, and removing' oil, gas, and their constituents from" the Dansburys' property in Bradford County, Pennsylvania. (*Id.* at ¶¶ 11-12, 18-19.) The five year term was "to be secured by drilling within 90 days [of the date of commencement, March 26, 2001] or by a Delay Rental of $607.45 per year, payable annually or quarterly, pending commencement of a well." (*Id.* at ¶ 19.) The Lease would be extended beyond the original term "for as long as the Lessee 'is engaged in the production of oil and/or gas on the leased premises.'" (*Id.* at ¶ 20.) Additionally, the Lease could be renewed for one additional five year term by an option payment, in which case it would still be governed by the original terms. (*Id.* at ¶ 21.) Ultimately, the Lessee did in fact renew the Lease in March 2006 for another five year term. (*Id.* at ¶ 22.)

However, the Complaint goes on to allege a number of deficiencies in EOG and its predecessors' actions under the Lease.

2

First, as discussed above, the Lease requires that the Lessee must either operate the well continuously on the leased premises or pay a delay rental fee. But neither the original Lessee nor any successor produced gas or "continuously prosecuted"[1] drilling operations on the leased lands during either the primary or renewal term of the Lease, and paid no delay rental since March 2010. (*Id.* at ¶¶ 23-24.)

To escape its contractual obligations related to such nonuse, Defendant allegedly engaged in a bad faith plan to recharacterize the Dansburys' well. (*See id.* at ¶¶ 45, 63-65.) This plan relied on the "consolidation" provision of the Lease, which "provides that the leasehold or portions thereof could be 'consolidated' with other lands to form 'an oil and gas development unit' . . . for the purpose of drilling a well thereon." (*Id.* at ¶ 25.) Lands that were consolidated under the consolidation provision would be treated as one unit, such that drilling operations on one property would be treated as though conducted on the others within the consolidated unit. (*See id.* at ¶ 27.) In order to make such a consolidation, the Lessee must execute a declaration of consolidation "setting forth the leases or portions of leases to be consolidated," record the declaration in the Recorder's Office of the county where the leasehold lands are located, and mail a copy of the declaration to the Lessor. (*Id.* at ¶¶ 28-29.)

---

[1] The Second Amended Complaint reads: "no drilling operations have not been continuously prosecuted on the leased lands by the Lessee or any successor, including the Defendant, during the primary term or Renewal Term of the lease." (*Id.* at ¶ 23.) The Court reads the double negative as a typographical error because, if taken as true, this paragraph would undercut and contradict the rest of the factual allegations in the Second Amended Complaint. (*Cf. id.* at ¶ 62 ("Defendant's failure to . . . continuously prosecute drilling operations, caused the lease to expire.").)

On January 27, 2011, Defendant recorded with the Bradford County Recorder of Deeds a declaration for a new unit called the "Demeo Unit." (*Id.* at ¶ 31.) On March 1, 2011, shortly before the expiration of the renewal term of Plaintiffs' Lease, the Defendant recorded a revised unit designation for the Demeo Unit (styled in the Complaint as "First Revised Unit Designation"), which included 46.862 acres of Plaintiffs' leasehold lands. (*Id.* at ¶¶ 32-33.) The unit designation was again revised with the Bradford County Recorder on October 31, 2011 ("Second Revised Unit Designation") even though, in the absence of proper consolidation, the Lease would have expired on March 25, 2011. (*Id.* at ¶ 34.)

The problems with this, as alleged in the Second Amended Complaint, are twofold. First, the Unit Designations were not "workable, good faith production units," (*id.* at ¶ 39), or even "capable of production," (*id.* at ¶ 44). Instead, "the Demeo Unit was installed to create a placeholder well in an effort to hold the lease in effect" when it would have otherwise expired for lack of use. (*Id.* at ¶ 45.) Thus, "the First Revised Unit Designation and the Second Revised Unit Designation were recorded in bad faith," in that the first was recorded shortly before the Lease expiration to hold the Lease open and the second was recorded seven months after the Lease would have expired under its own terms. (*Id.* at ¶¶ 63-65.) Second, Defendant gave improper notice under the lease. Plaintiffs did not receive any copy of the original Designation or subsequent Revised Designations before the expiration of the Lease term on March 25, and only received a letter informing them of such, which

4

was addressed to the elder Dansburys but mailed to the younger, several months after the Lease's purported expiration date, on June 21, 2011. (*Id.* at ¶¶ 35-36.)

Next, the Lease provided that the Lessee would test Plaintiffs' water supply "as to quality and quantity" before commencing, and following, drilling operations on Plaintiffs' land. (*Id.* at ¶ 46.) Plaintiffs allege that "no water testing has been done" even though "Defendant has since made application for, and otherwise commenced, drilling and/or production operations on the Demeo Unit in which a portion of Plaintiffs' lands are purportedly consolidated." (*Id.* at ¶ 47.) This, Plaintiffs aver, constitutes a breach of the Lease. (*Id.* at ¶ 59.)

Pursuant to the terms of the Lease, which required written notification of any purported breaches thereof, (*see id.* at ¶ 50), Plaintiffs mailed to Defendant a letter of counsel dated May 5, 2011, informing Defendant of some of the above breaches and demanding that Defendant remedy them, (*id.* at ¶ 51). Defendant never replied to this letter and made no subsequent efforts to remedy the alleged breaches. (*Id.* at ¶ 52.)

Plaintiffs then filed this lawsuit, which seeks, under the most recent Complaint, a declaration of the rights of the respective parties, including a declaration that the Lease is "forfeited, null and void and/or expired without extension" and that the Revised Unit Designations are unenforceable, as well as a variety of contract, quasi-contract, and tort remedies. (*See id.* at ¶¶ 66-68.)

5

In response, Defendant filed the instant Motion to Dismiss. (See Doc. 40.) The Motion requests only that the Court dismiss Count II (Slander of Title), Count III (Breach of Contract), and Count V (Unjust Enrichment), (Def.'s Mot. to Dismiss Pls.' Second Am. Compl., Doc. 40, at ¶ 5), on various grounds, pleading that "[t]his matter should be permitted to continue only as the declaratory judgment action that it really is—not as the speculative high-stake damages action that Plaintiffs seek to create," (Def.'s Brief in Supp. of Mot. to Dismiss, Doc. 41, at 3). The Court will now turn to the merits of Defendant's Motion.

## III.     Standard of Review

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" DelRio-Mocci v. Connolly Prop. Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Twombly, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Covington v. Int'l Ass'n of Approved Basketball Officials, 710 F.3d 114, 118 (3d Cir. 2013)

(internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations, alterations, and quotation marks omitted). This "plausibility" determination will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV.   Analysis

### a.  Slander of Title (Count II)

Defendant first seeks to dismiss Plaintiffs' slander of title claim. (*See* Doc. 41 at 9.)

In their Second Amended Complaint, Plaintiffs allege that the Second Revised Unit

Designation and letter of June 21, 2011 "are published false statements intended to convey

the impression that the Lease remained in full force and effect" and that Defendant had

satisfied all requirements to extend the terms of the Lease. (*See* Doc. 35 at ¶¶ 95-97.)

According to Plaintiffs, these false statements clouded their title to their property by

preventing Plaintiffs from "renegotiating their Lease." (*See id.* at ¶¶ 99-103.)

"[S]lander of title . . . is the false and malicious representation of the title or quality of

another's interest in goods or property." *Pro Golf Mfg., Inc. v. Tribune Review Newspaper*

*Co.*, 809 A.2d 243, 247 (Pa. 2002) (quoting *Triester v. 191 Tenants Ass'n*, 415 A.2d 698,

701 (Pa. Super. Ct. 1979)).

[T]he publication of a disparaging statement concerning the business of another is actionable where:  (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.

8

*Id.* at 246 (citing Restatement (Second) of Torts, § 623A). Moreover, "[p]ublication of [a disparaging statement] is its communication intentionally or by a negligent act to someone other than the person whose interest is affected." Restatement (Second) of Torts, § 630.

Defendant moves to dismiss this claim on two grounds. First, Defendant argues that the June 21 letter cannot be a "publication" because it was not made to a third party; it was only a letter sent by EOG to the Dansburys. (Doc. 41 at 10-11.) Second, Defendant argues that, even as to the Second Revised Unit Designation, Plaintiffs have not shown damages, because the only damage that Plaintiffs contend that they suffered was the inability to renegotiate their Lease with EOG. (*Id.* at 11.) Obviously, if this were true, then Plaintiffs' claim would be nonsensical, because slander cannot occur when a slanderer conveys information to itself; for the tort to become actionable, Plaintiffs must show communication to some third party.

As to the first ground, the Court agrees with the Defendant that the June 21 letter does not appear on the face of the most recent Complaint to constitute a publication. The only discussion of the letter contained in the Second Amended Complaint is that it was a statement, addressed to Arthur and Joan Dansbury at the mailing address for Arthur B. and Nancy Dansbury, that notified the addressees that the Defendant had purported to create a unit that included part of their land. (Doc. 35 at ¶¶ 35-36.) The letter itself, attached as Exhibit H to the Second Amended Complaint, does not say anything more. (*See id.*, Ex. H, at 1.)

9

Accordingly, there is no reason to believe, on the face of the Second Amended Complaint and the attachments thereto, that this letter was published to any third parties. Plaintiffs admit that they "have no idea at this point to whom the letter was published beyond themselves." (Pls.' Resp. to Def.'s Mot. to Dismiss, Doc. 42, at 10.)  But while Plaintiffs need not plead detailed factual allegations, to survive a motion to dismiss they must do more than plead the mere possibility that the alleged defamatory statements were published.  In the absence of any allegations that they were in fact published—or even an allegation explaining what motive EOG would have to disclose a private correspondence referring to information that is already of public record—the Court must dismiss this claim as it relates to the June 21 letter.

However, even though Plaintiffs have not alleged sufficient facts to indicate that the June 21 letter gave rise to a cause of action, the slander of title claim may proceed as to the Second Revised Unit Designation.  The Second Amended Complaint properly pleads that Defendant recorded the Second Revised Unit Designation with the Bradford County Recorder of Deeds, (Doc. 35 at ¶ 34), and that the information recorded was false, because the designation was not permitted under the contract, (*id.* at ¶¶ 57-58, 62-65).  Moreover, information filed of public record can give rise to a slander of title action, as it can constitute a publication made to the public at large that could prevent the Plaintiffs from being able to convey clear title to their property. *See, e.g.*, *Forman v. Cheltenham Nat'l Bank*, 502 A.2d 686, 687 (Pa. Super. Ct. 1985); *see also Glenn v. Dunlop*, 423 Fed. App'x 249, 250 (3d Cir.

2011).  And while there is no information in the Second Amended Complaint that indicates that Defendant *knew* that the information recorded was false, if we take all well pleaded facts in the Second Amended Complaint as true, then there is reason to infer that Defendant *should have known* that the information recorded was false.

Defendant's second argument, then, hinges on its interpretation that the Second Amended Complaint only pleads that the recording of the Second Revised Unit Designation prevented Plaintiffs from renegotiating their Lease with EOG.  (Doc. 41 at 12.)

It is true that the Second Amended Complaint only refers to Plaintiffs' inability to "renegotiate their Lease" without reference to the party with whom they were prevented from renegotiating, (*see* Doc. 35 at ¶¶ 101-03), and, further, that the term "renegotiate" could be taken to imply subsequent negotiations between the same parties as initially contracted.[2] However, the Court cannot dismiss Plaintiffs' claim on such a fine technical distinction. First, as Plaintiff states, "Plaintiffs pled their inability to renegotiate their lease unequivocally—not with regard to EOG." (Doc. 42 at 11.)  This interpretation of the allegations is just as arguable as that of the Defendant.  So even if, for instance, the unqualified statement that Plaintiffs were prevented from having "the opportunity to renegotiate their Lease" *might be* interpreted as implying renegotiation only with EOG, the Court sees no basis, at the motion to dismiss stage, to declare as a matter of law that

---

[2] The Oxford English Dictionary defines "renegotiate" as "to negotiate (something) again, esp. in order to change the original terms of an agreement." OXFORD ENGLISH DICTIONARY, "renegotiate," *available at* http://www.oed.com/view/Entry/162417?redirectedFrom=renegotiate#eid (last accessed June 12, 2014).

Plaintiffs' allegations must be interpreted in the most uncharitable light possible, and then dismissed on those grounds. Second, it is not even clear from the definition of the word "renegotiate," *supra* note 2, that it must only refer to agreements between the same contracting parties. It is certainly possible that two new parties could "change the original terms of an agreement" that they did not themselves originally draft. When read in the context of the whole Second Amended Complaint—and given the unreality of an interpretation that would envision EOG dealing at arm's length with itself—the Court believes that the most reasonable interpretation of Count II is that Plaintiffs were prevented the opportunity to "renegotiate their Lease *with third parties*."

Accordingly, the Court will dismiss Count II as it pertains to the June 21 letter but will allow it to go forward as to the Second Revised Unit Designation. Dismissal of the allegations pertaining to the June 21 letter, however, will be dismissed with leave to amend so that Plaintiffs may have one final opportunity to allege facts indicating that the letter was actually published to some third party. While the Court is aware that Plaintiffs have already filed three Complaints in this case, it believes that leave to amend is nonetheless appropriate one more time, given that this Opinion is the first substantive ruling that the Court has made on any of the Complaints.

### b. Breach of Contract

Next, Count III of the Second Amended Complaint alleges several breaches of contract. First, it alleges that Defendant failed to make any delay rental payments since

12

March 2010, thus terminating the Lease. (Doc. 35 at ¶ 116.) Second, "[d]espite termination

of Defendant's rights under the Lease, Defendant filed an instrument [presumably the

various Revised Unit Designations] proclaiming Defendant was exercising rights it no longer

was entitled to." (Id. at ¶ 117; see also id. at ¶ 119 ("Defendant's right to unitize the land

terminated upon nonpayment of delay rental.").)  That is, "Defendant breached the terms of

the parties' contract by exercising rights only authorized during a valid lease term." (Id. at ¶

122.)  Third, Defendant did not test Plaintiffs' water as required by the lease. (Id. at ¶¶ 124-

125.)  Fourth, Defendant did not provide a copy of a notice of consolidation when it

consolidated a portion of Plaintiffs' land with the Demeo Unit. (Id. at ¶¶ 128-129.)

On the basis of all these allegations, Plaintiffs concluded Count III with a plea for

both compensatory and punitive damages. (See id. at p. 30, Wherefore Clause.)

Defendant, in turn, now seeks dismissal of the Breach of Contract claim on multiple

other grounds, which the Court discusses below.

### i.  Failures of Conditions vs. Breaches of Contract

First, Defendant argues that "the alleged failure to provide Plaintiffs with notice of the

unitization and to conduct water testing was not a breach of the Lease." (Doc. 41 at 13.)  It

later adds, in response to Plaintiffs' Brief in Opposition, that its obligation to make delay

rental payments was not a breach either. (Def.'s Reply to Pls.' Resp. to Mot. to Dismiss,

Doc. 43, at 3.)  Rather, all of these requirements were simply "conditions necessary to

extend the lease," Defendant argues. (*Id.* at 14-15.) Accordingly, Plaintiffs' remedy must be

"limited to a declaration that the Lease terminated." (*Id.* at 15.)

> Under Pennsylvania law,
>
> a lease is in the nature of a contract and is controlled by principles of contract law. It must be construed in accordance with the terms of the agreement as manifestly expressed, and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement."

*T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012) (quoting *J.K. Consol.*

*Coal Co.*, 637 A.2d 979, 982 (Pa. 1994)). Here, the language of the Lease is plain and

unambiguous. The primary question for resolution is only whether the various provisions

are best characterized as independent duties or as conditions to performance under the

express terms of the contract.

"There is a distinction in the law between failure of a condition and a breach of a

duty: 'Non-occurrence of a condition is not a breach by a party unless he is under a duty

that the condition occur.'" *In re Columbia Gas Sys., Inc.*, 50 F.3d 233, 241 (3d Cir. 1995)

(quoting Restatement (Second) of Contracts § 225(3)). "A condition is an event, not certain

to occur, which must occur, unless its nonoccurrence is excused, before performance under

a contract becomes due." *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739

A.2d 133, 139 (Pa. 1999) (quoting Restatement (Second) of Contracts § 224). "Where a

condition has not been fulfilled, the duty to perform the contract lays dormant and no

damages are due for nonperformance." *Id.* Moreover, "[t]he determination whether a

14

contract term is a promise or condition is a problem of interpretation, so that each case

turns on its own facts." *Columbia Gas*, 50 F.3d at 241 (internal quotation marks omitted).

Applying these general principles to the present case, the Court notes that, as to

Defendant's failure to make delay rental payments, the Lease states:

> This lease . . . shall become null and void and all rights of either party shall
> cease and terminate unless within Ninety (90) days from the effective date
> hereof, a well shall be commenced on the premises, or unless the Lessee
> shall pay a delay rental of ($607.45) Six Hundred Seven and 45/100 Dollars
> each year, payments to be made annually or quarterly until the
> commencement of a well.

(Lease, Doc. 35, Ex. A, at ¶ 4.)

The Court agrees with Defendant's interpretation that this provision only states a

condition necessary to extend the Lease. Pennsylvania courts have held that the phrase

"shall become null and void" means that the agreement becomes a nullity automatically

upon the occurrence or nonoccurrence of the enumerated action. *Cf. Ormond Realty v.

Ninnis*, 491 A.2d 169, 172 (Pa. Super. Ct. 1985) (holding that a contract which states that if

a "mortgage loan cannot be obtained this agreement *shall be* NULL AND VOID and all

deposit moneys shall be returned to the Buyer" means that "the agreement becomes a

nullity simply if a mortgage is not secured by the commitment date"). Thus, here,

Defendant's failure to make delay rental payment would, under the allegations of and

attachments to the Complaint, simply terminate the Lease, as illustrated by the language

"and all rights of either party shall cease and terminate." Plaintiffs cannot base a breach of

contract claim on actions whose occurrence is only a condition to extend the lease.

15

The same analysis applies to the notice of unitization allegedly not provided to

Plaintiffs. The Lease states, in pertinent part:

> The Lessor hereby grants the Lessee the right at any time to consolidate the leased premises or any part thereof or strata therein with other lands to form an oil and gas development unit of no more than 640 acres or such larger unit as may be required by state law or regulation for the purpose of drilling a well thereon . . . . *The Lessee shall effect such consolidation* by executing a declaration of consolidation with the same formality as this oil and gas lease setting forth the leases or portions thereof consolidated and recording the same in the recorder's office at the courthouse in the county in which the leased premises are located and *by mailing a copy thereof to the Lessor at the address hereinabove set forth unless the Lessee is furnished with another address.*

(Doc. 35, Ex. A, at ¶ 11 (emphasis added).)

Again, this provision is written in terms of what actions the Lessee must take before

a consolidation can take effect, as shown by the use of the language "the Lessee shall

effect such consolidation by . . . ." If it is true that Defendant did not mail a copy of the

declaration of consolidation to the Plaintiffs—as we assume for purposes of a motion to

dismiss—then all this means is that the consolidation cannot take effect under the terms of

the agreement. This would not, however, constitute a breach of contract, but would simply

mean that Defendant did not meet the necessary conditions to consolidate the units and

that the unit designations are therefore null and void.

Finally, as to the water testing, the Lease states in an addendum that "Lessee shall

test Lessor's domestic water supply (as to quality and quantity) prior to commencement of,

and following, drilling operations on said land in order to ensure that said water supply is not adversely affected by said operations." (*Id.*, Addendum, at ¶ 3.)

In contrast to the provisions discussed above, the Court cannot agree that the Complaint only alleges the failure of a condition as to water testing. It is true that, under the apparent terms of the Lease, Defendant can only commence drilling if it first tested Plaintiffs' water supply. But if Defendant failed to abide by these conditions and commenced drilling without testing the water supply, then it cannot be that "Plaintiffs [*sic*] remedy . . . is limited to a declaration that the Lease terminated," (Doc. 41 at 15), for the simple reason that a declaration cannot undo the physical act of drilling. By claiming that Plaintiffs are limited to a declaratory judgment that Defendant's drilling was not permitted under the Lease, Defendant essentially argues that it may engage in physical acts that cause damage to Plaintiffs, with no more relief afforded than a judicial declaration, so long as Defendant first fails to fulfill the conditions that make such acts permissible. The Court cannot accept such perverse reasoning.

The Lease also states that the Lessors have a duty to inform the Lessee in writing of any breach the Lessors believe to have occurred. (*Id.*, Ex. A, at ¶ 19.) Plaintiffs attached to their Second Amended Complaint a letter from Attorney Taunya Knolles Rosenbloom indicating that the Defendant was in breach of its duty to make delay rental payments and that Defendant had engaged in bad faith unitization. (*See* Taunya Knolles Rosenbloom Letter of May 5, 2011, Doc. 35, Ex. I, at 1-2.) The letter does not specifically assert

17

breaches as to the notice of the unitization or the water testing. Nonetheless, whether adequate notice of each breach now asserted by Plaintiffs was ever provided on these additional questions is a factual question to be resolved after further discovery. There is no reason to conclude, on the face of the Second Amended Complaint and its attachments, that Plaintiffs were in default of these other obligations. If discovery shows that they were, then those arguments can be reasserted at the appropriate time.

### ii. Unit Designations

#### 1. Duty of Good Faith and Fair Dealing and the Doctrine of Necessary Implication

The only remaining claim under Count III is Plaintiffs' claim that the various unit designations were undertaken in bad faith. Because no specific provision of the Lease pertains to Defendant's conduct—and because Defendant is explicitly authorized to consolidate units under the Lease if it does so for a proper purpose—Plaintiffs characterize Defendant's conduct as violative of the duty of good faith and fair dealing and of the doctrine of necessary implication, both of which are implicit in every contract in Pennsylvania. *See id.* at ¶¶ 131-142; *cf. also John B. Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696, 706 (Pa. Super. Ct. 2003). The two Revised Unit Designations, Plaintiffs allege, "violated the covenant of good faith and fair dealing implicit in the lease, *inter alia*, in evading the spirit of the bargain, lack of diligence and willfully imperfect performance, and abuse of the power to unitize" because both Designations were "intended solely to act as a placeholder well, not to establish a producing well." (Doc. 35 at ¶¶ 134, 136.) Likewise, Defendant's action violated

the doctrine of necessary implication, in that they were not acts "that according to reason and justice [Defendant] should do in order to carry out the purpose for which the contract was made" but rather were bad faith violations of "the dictates of reason and justice in the execution and performance of the contractual power of unitization." (*See id.* at ¶¶ 137-138, 140.)

As the Pennsylvania Superior Court has framed the issue,

[t]he law is clear that [i]n the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. Accordingly, a promise to do an act necessary to carry out the contract must be implied.

*Daniel B. Van Campen Corp. v. Bldg. & Constr. Trades Council of Philadelphia & Vicinity*, 195 A.2d 134, 136-137 (Pa. Super. Ct. 1963) (internal quotation marks and citations omitted). However, the duty of good faith and fair dealing and the doctrine of necessary implication "cannot trump the express provisions of the contract." *Conomos*, 831 A.2d at 706. Instead, "they serve as gap fillers." *Id.* They are "principles for courts to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract." *Id.* at 707. Thus,

[w]hen an obligation necessary to [Plaintiff's] enjoyment of the contract is not expressly provided but implied as a necessary implication of the contract, [Defendant's] good faith performance is necessary to satisfy the implied obligation. [Defendant's] lack of good faith performance, or its bad faith, can result in a breach of an obligation necessarily implied by the contract.

19

*Id.*

The obligation for Defendant to follow the contract in good faith is clearly "an obligation necessary to Plaintiffs' enjoyment of the contract," which, though not specifically enumerated, must be read into the contract if the contract is able to have any meaning at all. In other words, the requirement that Defendant act in good faith in discharging its contractual obligations is so fundamental to the purposes for which the contract was created that the Court may, under Pennsylvania law, infer such a requirement into the written contract, even if the contract itself does not specifically prohibit Defendant from acting in bad faith. And because the Complaint provides sufficient allegations that Defendant acted in bad faith by filing the unit designations, the Court finds that Plaintiffs have properly alleged a breach of contract via the duty of good faith and fair dealing and the doctrine of necessary implication.

Despite Defendant's assertions, the case *Stewart v. SWEPI, LP*, 918 F. Supp. 2d 333 (M.D. Pa. 2013) is not to the contrary. In that case, the Plaintiffs alleged a claim styled "breach of the covenant of good faith and fair dealing" without bringing any breach of contract claim or alleging that a breach of contract occurred. *See Stewart*, 918 F. Supp. 2d at 335, 344. Nor would the *Stewart* Plaintiffs even commit to a position on whether the good faith claim sounded in tort or contract. *Id.* at 344. The Court, therefore, correctly noted that "Pennsylvania law does not recognize a separate cause of action for breach of the covenant 'because such a breach is merely a breach of contract.'" *Id.* at 343-44. It concluded

succinctly: "Plaintiffs' claim for breach of the covenant of good faith and fair dealing fails to state a claim upon which relief can be granted because plaintiffs have not alleged breach of contract." *Id.* at 344.

In the present case, Plaintiffs *did* plead a breach of contract, because "the covenant of good faith and fair dealing acts as a term of the contract," such that actions in bad faith that frustrate the purpose of the contract must be treated as breaches of the contract itself. *See Zaloga v. Provident Life & Accident Ins. Co. of Am.*, 671 F. Supp. 2d 623, 630 (M.D. Pa. 2009). To adopt Defendant's reading of *Stewart* would effectively nullify the good faith and necessary implication doctrines, in that those doctrines would be impossible to allege so long as Defendant's conduct—no matter how egregious—only violated the unenumerated assumptions and purposes on which the contract was founded, but did not violate any specific written paragraph.

### 2. Timing of the Second Revised Unit Designation

Defendants' final attack on the breach of contract claim related to the unit designations argues that the Second Revised Unit Designation cannot constitute a breach of contract because it occurred after the time in which the Second Amended Complaint alleges that the Lease expired. (Doc. 41 at 15.)

This point largely rests on semantics. Obviously, a party cannot breach a Lease that no longer exists. However, the first two unit designations were made during the renewal term of the Lease and, under the facts as alleged in the Second Amended Complaint, may

well have been bad faith breaches of contract.  If these first two designations are later found to have constituted a breach of Defendant's duties to Plaintiffs, then Plaintiffs may recover damages for them.  These could potentially include damages incurred through the filing of a Second Revised Unit Designation, if such was sufficiently connected to the filing of the initial unit designations in violation of the Lease.[3]

At this early stage, the allegations related to the Second Revised Unit Designation are so intertwined with those related to breaches of good faith and fair dealing that occurred during the term of the Lease that attempts to separate or distinguish them would be unhelpful and would unduly limit remedies for damages sustained as a result of actual breaches made during the Lease term.  Therefore, the Court cannot dismiss the breach of contract claims that refer to the Second Revised Unit Designation at this stage.

### iii.  Status of Count III

In summary, Plaintiffs' Breach of Contract claim will be allowed to proceed as to the alleged breaches of the duty of good faith and fair dealing and doctrine of necessary implication and for a failure to test the water supply.  The claim will be dismissed, however, insofar as it alleges that Defendant failed to make delay rental payments or provide a proper notice of unitization.  But this is not to say that the latter claims must be stricken from the Complaint; it only means that they cannot state a claim for breach of contract under the

---

[3] As discussed elsewhere in this Opinion, Plaintiffs could also recover for damages sustained through the Second Revised Unit Designation through quasi-contract or tort remedies.

terms of the Lease.[4] Nonetheless, they may be properly alleged as part of the declaratory

judgment claim and, if proven, could lead to the determination that the Lease terminated

earlier than alleged and/or that the unit designations were void *ab initio*. Moreover, Plaintiffs

are still able to claim damages[5] that were technically incurred outside of the primary or

renewal Lease term if they were reasonably foreseeable consequences of breaches that

occurred while the Lease was in effect. Finally, Plaintiffs may also recover under the unjust

enrichment theory, discussed below, for any unjust benefits that Defendant obtained at

Plaintiffs' expense outside either term of the Lease and which do not flow from breaches of

the written Lease.[6]

With this in mind, Plaintiffs will be given leave to amend to reorganize the Complaint

so that the dismissed aspects of Count III are alleged in the proper section and, in so doing,

that Plaintiffs may add any new counts that this Opinion makes reasonably necessary.

### c. Unjust Enrichment (Count V)

The last claim subject to the Motion to Dismiss is Plaintiffs' claim for unjust

enrichment. In this claim, Plaintiffs allege that the Lease terminated when Defendant

---

[4] For that reason, they will be dismissed from Count III without leave to amend, because amendment could not give new meaning to the clear terms of the Lease

[5] In its Reply Brief, Defendant challenges Plaintiffs' claims for damages in Count III, especially as it pertains to punitive damages. (Doc. 43 at 6.) The Court will not rule on this argument at this stage because,

> [i]n ruling on a motion, "a district court need not address issues raised for the first time in a reply brief." *Dreyer v. Sheaffer*, 2009 WL 917829, at *3 (M.D.Pa.2009). That is because "[a] reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues." *United States v. Martin*, 454 F.Supp.2d 278, 281 n. 3 (E.D.Pa.2006) (collecting cases).

*Matthews v. Runco's Tavern & Grill, Inc.*, 2013 WL 6055219, at *2 (M.D. Pa. 2013).

[6] This is stated with the qualifications given in *infra* note 7.

23

stopped paying delay rentals in March 2010 and that, in the time since then, Defendant has

retained benefits for which it has not paid, primarily through filing the various unit

designations. (Doc. 35 at ¶¶ 151-56.)

Defendant argues that this claim should be dismissed because "Plaintiffs do not

allege that they conferred any legally recognizable benefit on EOG." (Doc. 41 at 19.)

Defendant then elaborates that

> [w]hile the Plaintiffs contend that EOG retained benefits under inequitable
> circumstances by asserting that the Lease is in effect, this does not amount to
> a benefit to EOG. If the Plaintiffs are right that the Lease terminated at the
> end of its primary term in March 2011, EOG will have enjoyed no benefit from
> asserting its position that that the Lease remains in effect. In that event, EOG
> will be left without a lease to develop the oil and gas on Plaintiffs' property
> and will have gained nothing.

(*Id.* at 20.)

This argument, however, reflects a contorted understanding of the word "benefit."

"Unjust enrichment is essentially an equitable doctrine, application of which depends on the

particular factual circumstances of each individual case." *Walter v. Magee-Womens Hosp.*

*of UPMC Health Sys.*, 876 A.2d 400, 407 (Pa. Super. Ct. 2005) (citing *Schenck v. K.E.*

*David, Ltd.*, 666 A.2d 327, 328 (Pa. Super. Ct. 1995)).

> To prevail on a claim for unjust enrichment, a plaintiff must prove: (1) benefits
> conferred on defendant by plaintiff; (2) appreciation of such benefits by
> defendant; and (3) acceptance and retention of such benefits under such
> circumstances that it would be inequitable for defendant to retain the benefit
> without payment of value.

24

*Id.* (citing *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 507 (Pa. Super. Ct. 2003)). "Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred." *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. Super. Ct. 2001) (citing *Schenck*, 666 A.2d at 328-29).

It is indeed possible that Plaintiffs could eventually succeed on their Complaint and prove that Defendant wrongfully continued to operate under a Lease that had already expired. In such circumstances, the law would operate to declare the Lease expired and to return any benefit that Defendant may have received, as a result of its actions, to the Plaintiffs. But the possibility that Defendant would later lose this lawsuit and return the benefits received does not mean that Defendant "received no benefit" from its actions. To the contrary, when taking the facts of the Complaint as true, Defendant did receive the benefit of continuing to operate under a Lease that had already expired and preventing any potential competitors from operating on Plaintiffs' land. If these are not considered "benefits," then no one could ever logically recover under an unjust enrichment claim. The only way to succeed on such a claim would be to prove that a defendant received benefits unjustly. But then, paradoxically, that very act of successful proof would mean that the defendant actually received no benefit from its action, thus ending its liability.

Under the allegations of the Second Amended Complaint, Defendant clearly gained benefits at Plaintiffs' expense in the time between the purported expiration of the Lease and

the future disposition of this lawsuit; it gained certain legal rights to Plaintiffs' land that no one else could assert. Even if Defendant gained no actual profits from its actions, it gained the opportunity to do so, according to the Second Amended Complaint, by unfairly burdening Plaintiffs' land with claims of legal right. Moreover, these claims of legal right were at least of some value to the Defendant and some detriment to the Plaintiffs, given that the holder of a right to drill, even if it never exercises that right, is clearly in a different position than someone without that right, and that a landowner burdened by a drilling lease is in a different position from another landowner not so situated, which is evidenced by the fact that such rights are not given away by landowners for free. If these benefits were procured in bad faith, as alleged in the Second Amended Complaint, then it would be inequitable for Defendant to retain these them.

Finally, the principle "that the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract," *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006), cannot defeat Plaintiffs' claim. The unjust enrichment here refers to the benefits obtained after the Lease expired. (*See* Doc. 35 at ¶ 154 ("Defendant has retained benefits under inequitable circumstances, those being the improper and unauthorized recording of the Revised Unit Designations.").) To the extent that these do not flow directly from actions taken during the term of the contract, they can only be recovered through a quasi-contract remedy, because the contract

was no longer in force at the time that Defendant's benefits accrued.[7] Thus, unjust

enrichment is a proper vehicle through which to recover unjustly obtained benefits.

## V.   Conclusion

Based on the foregoing considerations, Defendant's Motion to Dismiss (Doc. 40) is

**GRANTED IN PART AND DENIED IN PART**.  A separate Order follows.


Robert D. Mariani
United States District Judge    6/13/14

---

[7] As discussed above, Plaintiffs' claims regarding the Second Revised Unit Designation could also be characterized as breach of contract claims.  The Court does not mean to imply that Plaintiffs could be allowed double recovery for damages related to the Second Revised Unit Designation.  Rather, it only holds that, at this stage, Plaintiffs may put forward alternative theories of relief.  *See* Fed. R. Civ. P. 8(a)(3). As the case develops, it will hopefully become clearer whether breach of contract or unjust enrichment presents the more appropriate means of relief.